## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Central Specialties, Inc.,                          Case No. 0:17-cv-05276 (MJD/LIB)

               Plaintiff,

v.

Jonathan Large and
Mahnomen County,

               Defendants.

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

## <u>INTRODUCTION</u>

This action arises from a contract between Plaintiff Central Specialties, Inc. ("CSI")
and the Minnesota Department of Transportation ("MnDOT") for road work to be
performed on State Highway 59 which spanned Becker County, Polk County, and
Mahnomen County over an area approximately 35 to 40 miles long. After submitting a
flawed bid and securing the contract for the Highway 59 Project, and discovering that
MnDOT had no intention of taking marching orders from CSI as its contractor, CSI has
now brought suit against MnDOT in state court, *see* Court File No. 44-CV-19-137, and also
commenced the instant action against Jonathan Large, the Mahnomen County Engineer,
and Mahnomen County.

As set forth in more detail below, CSI's claim against MnDOT cuts against the plain language of the contract to which they are parties. The claims in the instant case are no better and likewise lack merit. CSI claims exactly the same dollars in damages from the County and Large in this action that it is also claiming from MnDOT in the state court litigation. The § 1983 claims in this case—for which CSI has claimed damages amounting to a whopping $715.05—are merely present to split CSI's pretended cause of action between two cases and prevent the consolidation of those two cases.

In this case, CSI claims that Large and the County tortiously interfered with CSI's contract with MnDOT, violated the Fourth and Fourteenth Amendments in the process, and committed a trespass to two CSI trucks. For the reasons set forth below, these claims are not credible, are unsupported by the evidence and undisputed facts, and fail as a matter of law. This action is nothing more than an attempt by CSI to punish government officials who have resisted CSI in the past.

## FACTUAL BACKGROUND

### *The Project & The Standard Specifications*

CSI submitted a bid for the project in late 2016 and was the lowest bidder. (Depo. of CSI, 8:21–22). As part of the MnDOT contract, CSI was to propose "haul roads" which would be used by CSI to haul material from material pits located near the project. (Depo. of CSI, 26:9–16). MnDOT has the ultimate authority to accept or reject a contractor's proposed haul roads. (Depo. of CSI, 60:6–8, Ex. 7). The "haul road" designation is significant to a county. As a local road authority, the County is responsible for the maintenance and upkeep of all of its county roads. Minn. Stat. § 163.02; (Aff. of

Large, ¶ 2). When MnDOT designates a road as a "haul road," the road is removed from county jurisdiction and MnDOT's contractors are permitted to use the road in connection with a project. Minn. Stat. § 161.25. Roads are a consumable product and degrade with each use. (Aff. of Large, ¶ 3); (Depo. of CSI, 14:11–13). The type of use, weight and strain placed on the road, the existing condition of the road at the time of the use, and the time of year during which the use occurs all have an impact on the road. (Aff. of Large, ¶ 3). Once the haul road is released back to a county, the statute requires that MnDOT reimburse a county for that use dating back to its pre-designation condition. Minn. Stat. § 161.25 ("Prior to revoking the [haul road] designation, the commissioner shall restore such [haul roads] to as good condition as they were prior to the designation[.]").

Prior to bidding on the Highway 59 Project, CSI was aware of MnDOT's "standard specifications," which are a standardized set of rules which apply to all MnDOT contracts unless varied for that particular project. (Aff. of Large, ¶ 7); (Depo. of CSI, 9:3–13). Notably, the MnDOT standard specifications contained the following two requirements, among other items:

1515            CONTROL OF HAUL ROADS
* * *
The Department may, but is not required to, designate haul Roads in accordance with Minnesota Statutes § 161.25. If the Department has made a written designation of a haul Road, then the Department will have jurisdiction over the public Roads and Streets included in such designation. The requirements of 2051, "Maintenance and Restoration of Haul Roads," will govern the maintenance and restoration of such haul Roads.

If the Department has not made a written designation of a haul Road, then the Contractor will be responsible for the following:

(1)    Arranging for the use of Roads not under the jurisdiction of the Department,

(2)    Performing any maintenance and restoration as required by the applicable Road authority as a condition of use of such Road as a haul Road, and

(3)    Paying any fees, charges, or damages assessed by the applicable Road authority as a condition of using such Road as a haul Road.

\* \* \*

In preparing its Proposal, the Contractor is not entitled to assume that the Department will designate a haul Road, or that the haul Road designated will be the most convenient and direct route or not subject to reduced weight limits. The Department will not consider its decision to designate or not designate a requested haul route as a basis for contract revision.

(Aff. of Fullerton, Ex. C); (Depo. of CSI, Ex. 8).

2051.3      DESIGNATION AND USE OF HAUL ROADS

If the contract is with MnDOT for State Trunk Highway Projects, select haul roads and notify the Engineer of the selections. Within 15 calendar days after receipt of notification of the haul road selections, the Commissioner will determine the acceptability of the selected haul roads. If the haul roads are acceptable, the Commissioner will designate the roads as temporary trunk highway haul roads.

(Aff. of Fullerton, Ex. D); (Depo. of CSI, Ex. 7).

Standard Specification 1515 thus makes clear that a contractor "is not entitled to assume" that a particular proposed haul road will be designated, or that MnDOT is required to designate the haul roads that are most convenient for the contractor. Standard Specification 2051.3 provides for MnDOT's final authority in designating haul roads proposed by the contractor. CSI was aware of each of these provisions at the time of the bid. (Depo. of CSI, 9:3–13, 61:7–10). Even though the standard specifications plainly warn

the bidding contractors that contractors are *not* entitled to assume that the haul roads they propose will be designated by MnDOT, CSI apparently made that assumption anyway.

### The Preconstruction Meeting & The Haul Roads

Work on the Highway 59 Project was set to commence in the early summer of 2017. (Depo. of CSI, 8:2–7). A routine preconstruction meeting was held in April 2017 at the MnDOT district office in Detroit Lakes. (Depo. of CSI, 32:6–14). A representative of CSI attended this meeting, along with Ross Hendrickson (the MnDOT representative working with CSI), Large (the Mahnomen County Engineer), and others involved in the Highway 59 Project. *Id.* It was at this meeting that CSI first proposed that it would ask MnDOT to designate County State Aid Highway ("CSAH") 5, CSAH 6, and CSAH 10 as haul roads, along with roads in other counties. (Depo. of CSI, 32:6–14). CSI also revealed that it planned to haul 80,000-pound loads across these roads, which would have exceeded the weight restrictions imposed by the County. (Depo. of CSI, 34:4–15). At that time, CSAH 10 was weight restricted to seven tons per axle from the summer of 2016. (Aff. of Large, ¶ 5). Large made it known at that meeting that he objected to the use of CSAH 5, 6, and 10 as haul roads for several reasons, including imminent construction on CSAH 10 and including Large's concerns about overuse and rapid degradation of the roads. (Aff. of Large, ¶ 10). Around the same time that CSI submitted its bid on the Highway 59 Project, CSI also submitted a bid on a Mahnomen County project to restore CSAH 10, and so CSI was certainly aware that CSAH 10 would be under construction in 2017. (Aff. of Large, ¶ 6).

CSI looked to MnDOT to designate CSAH 5, 6, and 10 as "haul roads" pursuant to statute, which would then subject the designated portions of those roads to MnDOT's direct supervision and control. Minn. Stat. § 161.25. MnDOT refused to do so pending further investigation of the condition of the roads in question. (Depo. of CSI, Ex. 3). A meeting concerning the haul roads was held in May of 2017, after which MnDOT refused to designate CSAH 5, 6, and 10, and a road in Pembina Township, in Mahnomen County, CSAH 40 and 29 in Norman County, and CSAH 18 and 26 in Becker County pending further investigation. (Depo. of CSI, Ex. 3). MnDOT arranged for a pavement rating van and falling weight deflectometer which would evaluate road conditions above and below the surface of the road. *Id.* The testing of CSAH 5, 6, and 10 confirmed Large's concerns over the lack of strength of these proposed haul roads. (Aff. of Large, ¶ 11).

On or about May 26, 2017, MnDOT informed CSI that it would designate CSAH 5 and CSAH 10 as haul roads with a nine-ton weight restriction, and that it would designate CSAH 6 as a haul road with a seven-ton weight restriction. (Depo. of CSI, Ex. 5). A variety of other designations were made at that time as well, covering other roads. *Id.*

### CSI's Ultimatum & Use Of The Roads

In July of 2017, CSI decided that MnDOT was wrong not to designate CSAH 5, 6, and 10 without restrictions, and wanted to force the issue. (Depo. of CSI, 50:18–51:4). CSI gave MnDOT an ultimatum—either designate the roads or instruct CSI not to use them. *Id.* MnDOT refused to take the bait, and relied on its contract with CSI, stating:

> Any use of the county roads is with an agreement between CSI and the local road authority per specification. MNDOT has already designated routes for

this project as stated in a prior e-mail; if you shall choose to use alternate routes, it is solely at the discretion of CSI and the local road authority.

(Depo. of CSI, Ex. 6).

On July 17, 2017, CSI notified the County and MnDOT that CSI would commence using CSAH 5, 6, and 10 as haul roads despite MnDOT's consistent refusal to designate them as such. (Aff. of Large, Ex. B). On July 18, 2017, the Mahnomen County Board of Commissioners changed the weight restrictions on CSAH 10 from five-ton axle weight to five-ton total weight.[1] (Depo. of CSI, 12:4–12). Prior to noon that same day, Mahnomen County workers posted signs indicating the change in weight restriction and Large notified MnDOT of the County's change in weight designation. (Aff. of Large, ¶ 16). At 1:19 p.m. on July 18, 2017, Hendrickson, the MnDOT project supervisor, emailed CSI to notify CSI of the change in weight restriction. (Aff. of Large, ¶ 17, Ex. B).

Later in the afternoon, at about 2 p.m., Large observed two CSI trucks operating on CSAH 10 in a Mahnomen County work zone following the change in weight restriction. (Aff. of Large, ¶ 18). Large motioned to the drivers to pull over. The CSI trucks complied. Minutes afterwards, Large contacted the local sheriff's office, and the White Earth police responded. Large then left the responding officer to investigate and resolve the matter. Large was present at the scene for approximately an hour and a half in total. The CSI trucks were eventually permitted by law enforcement to leave the scene. (Aff. of Large, ¶ 19).

---

[1] An "axle weight" limit is the maximum distributed weight that may be supported by an axle of a vehicle. For example, a five-ton axle weight limit would equate to a loaded vehicle weighing no more than 15 tons total. (Aff. of Large, ¶ 4).

### *CSI's Claims Against MnDOT & Parallel Claims In This Case*

CSI was able to complete the Highway 59 Project, and then CSI brought suit against MnDOT alleging breach of the duty of good faith and fair dealing and attempting to hold MnDOT to some sort of implied standard by which MnDOT had an obligation to accept or reject CSI's proposed haul roads and failed to do so. (Aff. of Fullerton, Ex. B).

The reality is that CSI recognized in hindsight that it underbid the Highway 59 Project and failed to perform adequate due diligence when selecting its haul roads. Note that CSI's claimed damages in its litigation against MnDOT (which are identical to the damages claimed in this case) amount to $490,100.34. The gap between CSI's bid and the next lowest bidder was $452,464.62. (Aff. of Large, ¶ 8, Ex. A). CSI apparently neglected to do the same level of due diligence in assembling its bid as its competitors did, and now looks to its contracting partner to pay for CSI's mistake. CSI's action against MnDOT is an attempt to bully MnDOT into some sort of bailout for CSI's own failure to understand and accept its contractual obligations with MnDOT.

The instant lawsuit is no less frivolous. CSI has alleged tortious interference against Large and the County, claiming that Large and the County somehow interfered with CSI's performance of the contract with MnDOT. (Am. Compl. [Doc ID#32], ¶¶ 50–54). CSI claims damages arising from this claim in the amount of $490,100.34, which is precisely the same amount claimed from MnDOT in CSI's parallel litigation in state court. (Depo. of CSI, 67:13–23; Ex. 9, Ex. 10). As CSI's tortious interference claim is unsustainable in light of the undisputed facts and longstanding law, it fails.

CSI has raised constitutional claims arising from the alleged "traffic stop" which supposedly occurred when Large, the Mahnomen County Engineer, witnessed CSI trucks operating within the County's construction work zone on CSAH 10 in July 2017 and stopped them. (Am. Compl., ¶¶ 35–42). CSI posits that this was an egregious example of government overreach, and that it amounted to an automatic violation of the Fourth and Fourteenth Amendments. *Id.* CSI alleges damages attributable to these claims in the amount of $715.05. (Depo. of CSI, Ex. 10 [Interr. Resp. 13]). CSI arrived at this figure by multiplying each driver's hourly rate by three hours, the alleged duration of the stop.[2] (Depo. of CSI, Ex. 10 [Interr. Resp. 13]). As set forth below, no constitutional violation occurred, and CSI's § 1983 claims should therefore be dismissed.

Large and the County are entitled to qualified immunity and are protected from suit. Even if qualified immunity somehow were found not to apply, each of the claims alleged against Large and the County fail as a matter of law. Large and the County therefore respectfully request that the Court grant their joint motion for summary judgment and dismiss each of CSI's claims with prejudice.

---

[2] CSI's Statement of the Case in March 2018 [DOC ID#16] made no reference to the low damages claimed for the § 1983 claims. It is simply inexplicable as to why CSI did not include this information in its Statement of the Case, *see* Fed. R. Civ. P. 26(a)(1)(A)(iii), as the § 1983 "damages" were certainly known to CSI by that time.

## STATEMENT OF THE ISSUES

I.   WHETHER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AND ARE THEREFORE PROTECTED FROM SUIT.

   **Defendants Answer: YES.**

II.  WHETHER PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983 FAIL AS A MATTER OF LAW.

   **Defendants Answer:  YES.**

III. WHETHER PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.

   **Defendants Answer:  YES.**

IV.  WHETHER PLAINTIFF'S TRESPASS TO CHATTEL CLAIM FAILS AS A MATTER OF LAW.

   **Defendants Answer:  YES.**


## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To establish a genuine issue of material fact, a party "may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [that party's] favor." *Fatemi v. White*, 775 F.3d 1022, 1040 (8th Cir. 2015) (quotation omitted). Although the court views the evidence in the light most favorable to the nonmoving party and the moving party bears the burden of establishing the absence of genuine fact questions, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial." *Pederson v. Bio-Medical Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). The Supreme Court has emphasized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## ARGUMENT

### I.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

#### A.    Standard For Qualified Immunity.

The doctrine of qualified immunity shields federal and state government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects those officers that act within what they believe to be the scope of their duties. *See Hawkins v. Holloway*, 316 F.3d 777, 788 (8th Cir. 2003) (holding that "no reasonable official" in the sheriff-defendant's position "could have thought it within his duties to threaten his employees with deadly force." (emphasis added)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "In other words, officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quotations omitted). As qualified immunity entitles government officials to protection

from suit, courts have stressed the importance of resolving the qualified immunity question "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"The issue of qualified immunity is a question of law for the court, rather than the jury, to decide." *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004). In applying the qualified immunity doctrine, courts examine (1) whether the facts shown establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that his actions were unlawful. *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012). "[D]efendants are entitled to qualified immunity unless the answer to both of these questions is yes." *Id.* These two prongs may be addressed by courts in any order. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (holding that courts may resolve a qualified immunity defense solely by reference to the "clearly established" prong of analysis, and encouraging that practice when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

A plaintiff must identify either "controlling authority" or "a robust 'consensus of cases of persuasive authority'" that "placed the statutory or constitutional question beyond debate" at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The "clearly establish" law must not be established at a high level of generality. Rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* at 742 (emphasis added, quotation omitted).

**B.    Defendant Large Did Not Act Contrary To CSI's Clearly Established Constitutional Rights And Is Entitled To Qualified Immunity.**

CSI, apparently irritated that MnDOT had not immediately designated all proposed haul roads, attempted to force MnDOT to designate the road. (Depo. of CSI, 50:18–51:4, Ex. 6). MnDOT instead insisted that CSI come to an agreement with the County to arrange for the use of the road. (Depo. of CSI, Ex. 6). For whatever reason, CSI refused to do so, and instead indicated to MnDOT and Large on Friday, July 14, 2017, that CSI would simply begin using the roads anyway, advising Large and the MnDOT engineer on the project that CSI "plan[s] to use CSAH 6 . . . and CSAH 10 . . . as a return route for [CSI's] trucks . . ." (Depo. of CSI, Ex. 6).

Fearing that the roads would be subjected to significant strain and duress, Large then asked the County to impose per-axle weight restrictions. (Aff. of Large, ¶ 16). The County did so on July 18, 2017. Later that day, Large observed CSI using CSAH 10. (Aff. of Large, ¶ 18). This use was undeniably in violation of the newly-adjusted weight restrictions (CSI Depo., 12:4–16), and would have been a violation of the prior five-ton axle weight restrictions as well, if it had turned out that CSI's trucks were operating with a full load. (Aff. of Large, ¶ 18); (CSI Depo., 12:13–16).

There is no evidence that either the change in weight restriction or the alleged "traffic stop" constituted violations of CSI's constitutional rights. CSI seems to suggest that it is unconstitutional for *any* government actor, outside of law enforcement officers, to

conduct a "traffic stop."[3] This is an incorrect reading of the law. CSI has not cited to any authority, or come forth with any evidence, which shows a bright-line rule that *only* a law enforcement official may request that a commercial activity on a public road come to a brief halt while compliance with local laws is confirmed.

There is ample authority to support traffic control or detention mechanisms or actions taken by non-police officer actors. *See, e.g.*, Minn. Stat. § 629.37 (authorizing an arrest by a private person under limited circumstances). CSI is *itself* required to use "flaggers" to direct traffic on state-owned projects, including the Highway 59 Project. Nor has CSI made a cognizable argument that a county or local road authority cannot change its weight restrictions following credible indications that its roads will imminently come under increased load or traffic.

Because there is no bright-line authority which a reasonable official in Large's position would have understood to mean that he could not act to protect the County's roads, qualified immunity is appropriate. This case simply does not present, and CSI does not allege and cannot show, the type of "conscious-shocking, egregious behavior that is clearly outside the scope" of Large's authority, and so Large and the County are entitled to qualified immunity. *Moran v. Clarke*, 359 F.3d 1058, 1060 (8th Cir. 2004). Summary judgment is appropriate on this basis alone.

## II.    PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW.

---

[3] There is no allegation that Large improperly attempted to hold himself out as a police officer or otherwise mask the fact that he was a county official. Indeed, CSI concedes that Large called local law enforcement to handle the matter to its resolution.

In addition to its contract action against MnDOT, CSI improperly attempts to hold the County and Large liable for MnDOT's alleged breach of contract. CSI claims that "Mr. Large intentionally and improperly prevented [CSI] from using Mahnomen County Highway 10 in the performance of its contract with MnDOT by maliciously changing the highway weight limit signs and stopping [CSI]'s trucks that were using the route" thereby causing CSI to incur additional costs and expenses in its performance of the MnDOT contract, in the form of project delays and related costs. (Am. Compl., ¶¶ 52–54). CSI's claim fails on multiple levels.

To establish a claim for tortious interference with contract, Minnesota courts require a plaintiff to establish (1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of its breach; (4) no justification for the interference; and (5) damages. *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994); *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1137–38 (D. Minn. 2011). Where there is no induced breach of contract, recovery is possible only where the defendant commits an act "injuring or destroying persons or property which retards, makes more difficult, or prevents performance" of the contract. *Continental Research, Inc. v. Cruttenden, Podesta & Miller*, 222 F.Supp. 190, 198 (D. Minn. Sept. 27, 1963).

For summary judgment purposes, the County and Large do not dispute that there was a contract between CSI and MnDOT, and that Large knew of the contract. However, CSI has utterly failed to demonstrate that the allegedly wrongful conduct by the County and Large actually interfered with CSI's performance of the contract, that the allegedly

wrongful conduct was unjustified, that any damages resulted from the interference, or that Large may be held personally liable for any such damages. As a result, summary judgment is appropriate.

A. **CSI's Tortious Interference Claim Fails Because CSI Cannot Show That CSI Had A Reasonably Certain And Legally Enforceable Interest Or That The Defendants Interfered With That Interest.**

CSI has alleged that it had a contract with MnDOT which required CSI's "use of Mahnomen County Highway 10, 6, [and] 5" and that Large intentionally interfered with that contract "by maliciously changing the highway weight limit signs and stopping [CSI]'s trucks that were using the route." (Am. Compl., ¶¶ 51–52). CSI's claim fails at the first step of the tortious interference analysis for at least three reasons.

First, because CSI's contract with MnDOT specifically contemplated that MnDOT had the authority to designate, or not designate, all haul roads proposed by CSI, and therefore CSI had no right—whether contractual or otherwise—to haul on *any* road at *any* weight at *any* time, as CSI now claims. Mahnomen County had imposed a seven-ton weight restriction on CSAH 10 throughout 2016 and had placed a five-ton weight restriction on CSAH 10 in the spring of 2017. (Aff. of Large, ¶ 5). It is undisputed that a loaded CSI truck would have violated the weight restrictions that were in place before and after July 18, 2017. (Depo. of CSI, 12:4–16). The County had sole authority to adjust or impose weight restrictions on all undesignated county roads at all relevant times. Minn. Stat. § 163.02. The County's change in the weight restrictions on CSAH 10 therefore did nothing to impact CSI's performance under the contract.

Second, because CSI's contract with MnDOT was a bid contract, with CSI taking on the risk that its own cost of performance would exceed the bid. When CSI bid the project in December 2016, it was aware that MnDOT's standard specifications provided that CSI could not submit a bid with the assumption that all proposed haul roads would be designated by MnDOT. (CSI Depo., 62:1–10). Hindsight and extensive discovery in this case have revealed that in bidding the Highway 59 Project, CSI apparently made miscalculations that its competitors did not make, resulting in CSI being the lowest bidder. Whatever MnDOT's motivation for refusing to designate CSAH 10 as a haul road, it did not do so, and CSI was aware of that legal possibility under the terms of the contract and was instructed by MnDOT at the bidding stage not to assume that all haul roads proposed by CSI would be designated.

Third, because the MnDOT contract required that CSI work with local road authorities to use undesignated roads. (Depo. of CSI, 9:14–21). CSI was therefore contractually bound to confer with the County about the use of county roads for hauling activities in connection with the Highway 59 Project. (Depo. of CSI, 9:14–21). The County's fundamental interest in protecting its roads was thus enshrined in the contract itself, and CSI cannot claim surprise that the County would not welcome with open arms excessive overweight hauling operations which effectively would have caused Mahnomen County taxpayers to subsidize CSI's bid for the Highway 59 Project.

Each of these undisputed facts is fatal to CSI's interference claim. CSI's tortious interference claim is predicated upon a theory that the County's imposition of weight restrictions prevented CSI from performing under the contract, but the County's right to

impose or adjust these weight restrictions were known to CSI prior to bidding. CSI cannot claim that the County or Large interfered with its performance under the MnDOT contract when even CSI could not have expected, as a matter of law, to use any road that it chose for its hauling activities. CSI's rights under the contract were simply speculative as of July 2017. MnDOT had not yet designated haul roads and could have designated any roads that MnDOT found appropriate in its sole discretion. (Aff. of Fullerton, Ex. C). This alone could have significantly impacted CSI's bottom line. Therefore, while CSI certainly had a contract with MnDOT, the County and Large could not have interfered with the contract as a matter of law.

**B. Minnesota Counties And County Engineers Are Justified As A Matter Of Law When Setting And Enforcing Weight Restrictions.**

Minnesota courts have long held that a defendant in a tortious interference action cannot be held liable where his actions were justified by a lawful purpose that the defendant had a right to pursue. *Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 32 (Minn. 1982) (plaintiff's claim for tortious interference failed where debt collection method employed by defendants was "ethically and morally questionable" but was nonetheless a lawful method to collect a lawful debt). In other words, a defendant's actions are justified if the defendant pursued its legal rights through legal means. *Harman v. Heartland Food Co.*, 614 N.W.2d 236, 241 (Minn. App. 2000) (tortious interference claim "does not lie where the alleged interferer has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected and employs no improper means"); *Noble Sys. Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008) ("The general rule

with which we are concerned is that one has the right to be secured in his contracts and to pursue his business . . . free from the interference of others *except where such others act in pursuant of a superior or equal right*." (emphasis added)); *see also Spice Corp. v. Foresight Mktg. Partners, Inc.*, Civ. No. 07-4767-JNE/JJG, 2011 WL 6740333, at *19 (D. Minn. Dec. 22, 2011) ("Mere knowledge that a decision might affect other parties' contracts is not the same as intentional, unjustified interference."). "The court is not to look at the state of mind of the tort-feasor, but is to look to the actual, legal interest of the contract interfered with." *State of Minn. ex. Rel. Burlington Nat'l R.R. v. Big Stone-Grant Indus. Development & Transp., LLC*, 990 F. Supp. 731, 737 (D. Minn. 1997). A county's exercise of authority over the roads under its jurisdiction is not an unjustified and intentional interference into a contract involving the desired use of that road, as a matter of law. *Spice Corp. v. Foresight Marketing Partners, Inc.*, Civ. No. 07-4767-JNE/JJG, 2011 WL 6740333, at *19 (D. Minn. Dec. 22, 2011) (granting defendant's motion for summary judgment and holding that the defendant established that its conduct was justified as a matter of law); *see also* Minn. Stat. § 161.25 (authorizing the state to assume control of a road for haul road purposes).

Minnesota counties exercise authority over county roads. Minn. Stat. § 163.02. The Mahnomen County Engineer has a statutory duty to the public to ensure that county roads are in good condition. In this case, the Mahnomen County Engineer found that, due to the condition of CSAH 10, continued weight restrictions were appropriate. (Aff. of Large, ¶ 5). As the Mahnomen County Engineer, Large is empowered by statute to make such determinations. Minn. Stat. § 163.02, Subd. 3. The Mahnomen County Board of

Commissioners further authorized Large to use his discretion to determine whether additional weight restrictions were warranted. (Aff. of Large, ¶ 16).

When working with MnDOT at the routine pre-construction meeting in April 2017, Large expressed his honest belief that CSAH 5, 6, and 10 would not be appropriate as haul roads for the project. (Aff. of Large, ¶ 10). MnDOT was free to designate roads in its sole discretion; neither Large nor the County had any statutory or contractual authority to prevent MnDOT from doing so. (Depo. of CSI, 60:22–25). Large believed that CSI's impending use of CSAH 10 would cause severe stress on an already subpar road. (Aff. of Large, ¶ 10). Large knew that MnDOT had not designated the road as a "haul road" and removed it from County control, which MnDOT could have done at any time. (Aff. of Large, ¶ 15).

CSI has no evidence that the change in weight restriction was done with the intent to cause CSI to incur higher costs to complete its responsibilities under the MnDOT contract. Indeed, Large had no way of knowing at the time that CSI had seriously underbid the Highway 59 Project. Large acted appropriately as a matter of law, and the allegedly tortious conduct in this case amounts to nothing more than a public servant performing his duties and attempting to ensure that the damage to roads caused by commercial road construction projects was properly not borne by the taxpayers of Mahnomen County.

### C. CSI's Tortious Interference Claim Fails Because CSI Cannot Show That Its Damages Were Caused By The County Or Large As A Matter Of Law.

CSI has alleged in its parallel suit against MnDOT that MnDOT breached its contract with CSI by failing to designate the haul roads that CSI proposed. Indeed, it is

MnDOT's sole discretion to designate whatever haul roads it deemed sufficient for the project. (Aff. of Fullerton, Ex. B). MnDOT's standard specifications make absolutely clear that a contractor may not assume that proposed haul roads will be accepted. (Aff. of Fullerton, Ex. C).

CSI's tortious interference claim involves only the County's change in weight restrictions on CSAH 10. (Am. Compl. ¶¶ 50–54). It is undisputed that MnDOT could have designated CSAH 10 as a haul road without weight restrictions at any time. (Depo. of CSI, 60:12–61:13). Whether MnDOT was *required* to do so despite the plain language of the contract is an issue currently being litigated by CSI and MnDOT in CSI's parallel state court lawsuit. Either MnDOT was required to designate CSI's proposed haul roads and failed to do so, or MnDOT had discretion and CSI entered into the contract with an erroneous assumption or understanding. In either case, the County's weight restrictions cannot be said to have been the legal cause of CSI's alleged damages.

> **D.  Large Cannot Be Held Personally Liable For Alleged Interference Resulting From Actions Taken In His Capacity As The Mahnomen County Engineer.**

A longstanding concept recognized by Minnesota courts is that, when a defendant acts in his capacity as a representative of an organization, he is shielded from personal liability under a theory of tortious interference as a result. *Furlev Sales and Assocs., Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 26 (Minn. 1982). In *Furlev*, the Minnesota Supreme Court held that a shareholder of a company which contracted with the plaintiff could not be held personally liable for the shareholder's conduct which allegedly interfered with a contract that existed between the plaintiff and the company. *Id.*

The Court observed that "[t]he general rule is that officers of a corporation are shielded from personal liability for interference with contracts if they merely cause the corporation not to perform the contract . . . [t]o hold otherwise would burden corporate officers from acting in the best interests of the corporation." *Id.* (citations omitted).

In applying this contractual principle to the tort of tortious interference, the Court has routinely recognized that an individual who has a duty to act on behalf of an entity should not be held personally liable for acting within the scope of that duty to further the interests of the entity. *Howard v. Minnesota Timberwolves Basketball Ltd. Partnership*, 636 N.W.2d 551, 559 (Minn. App. 2001) (summary judgment in favor of arena manager was appropriate as to tortious interference claim where arena manager operated in his representative capacity only, and on behalf of the sports team); *see also Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982) (corporate officer could not be personally liable under a theory of tortious interference for merely causing the corporation not to perform the contract); *Space Center, Inc. v. 451 Corp.*, 298 N.W.2d 443, 454 (Minn. 1980) (actions of individual owners, officers, or directors of a corporation "cannot be separated sensibly" from the actions of the defendant corporation).

The same logic applies here. Large has a responsibility to keep the roads under his jurisdiction in good condition and repair. To subject Large to personal liability to a third party premised upon quirks or deficiencies present in the third-party's contract with the State would place an impossible burden on local officials who are operating entirely within the scope of their own authority. Large has a statutory responsibility to keep the roads of Mahnomen County safe, and he cannot be held liable for pursuing this purpose under a

tortious interference theory. The tortious interference tort was not developed to address this type of action, or this type of actor. Even if CSI's tortious interference claim somehow survives summary judgment, CSI cannot maintain this claim against Large as a matter of law.

## III. PLAINTIFF'S § 1983 CLAIM FAILS AS A MATTER OF LAW BECAUSE PLAINTIFF CANNOT SHOW THAT IT WAS DEPRIVED OF A CONSTITUTIONAL RIGHT.

"The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009). As CSI cannot establish either of these central elements, summary judgment is appropriate. *Id.* (affirming trial court's grant of summary judgment as to § 1983 claims).

### A. Plaintiff's Fourth Amendment Claim Fails As A Matter Of Law Because No Seizure Occurred And Large Acted Reasonably.

CSI claims that Large's interaction with two CSI trucks on July 18, 2017, constituted a violation of the Fourth Amendment. More specifically, CSI claims that this interaction was "per se unreasonable" because Large was not a law enforcement officer at the time of the interaction. (Am. Compl., ¶ 40). Under Fourth Amendment jurisprudence, no meaningful "seizure" occurred. Even if there was a technical "seizure" for Fourth

Amendment purposes, it was objectively reasonable under the circumstances. As a result, CSI's claim fails as a matter of law.

The Fourth Amendment requires that seizures be reasonable. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). The Fourth Amendment is viewed objectively and permits "certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren v. U.S.*, 517 U.S. 806, 814 (1996).

As the Supreme Court stated in *Terry v. Ohio*, a seizure occurs "[*o*]*nly* when the officer, by means of physical force or show of authority, has in some way *restrained the liberty of a citizen*." 392 U.S. 1, 19 n.16 (1968) (emphasis added). When determining whether a "seizure" has occurred, courts ask whether a reasonable person in the position of the person challenging the "seizure" would have believed himself free to "terminate the encounter" between the government official and himself. *Brendlin v. California*, 551 U.S. 249, 256–57 (2007).

Under the facts of this case, no "seizure" occurred. No reasonable road maintenance driver would have understood a county engineer to possess the same type of power to compel compliance akin to a law enforcement officer. Indeed, it is far more likely that a reasonable person in the position of a truck driver familiar with state and county road projects would have understood that there might be good reason—either safety or project related—to voluntarily comply with a motion or signal from a county highway department official to pull over and engage in a discussion. A reasonable driver would have understood

that the interaction with Large could have been terminated at any time or could have been avoided altogether.

Even if a "seizure" is deemed to have occurred, the duration of the seizure was fleeting and was reasonable. The Supreme Court has held that brief investigatory stops of persons that fall short of arrest are held to a less stringent standard. It has been said that this lesser standard requires something less than probable cause, and that "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot'[.]" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (*quoting United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Large certainly had sufficient reason to investigate upon witnessing the CSI trucks operating on CSAH 10. Large had personal knowledge that MnDOT had, pursuant to its contract, instructed CSI to work with the County prior to using CSAH 10. Large also had personal knowledge that CSI had announced its intention to operate on CSAH 10, with no way of knowing the details of that intended use. (Aff. of Large, ¶ 13). It is undisputed that a loaded CSI truck would have violated the weight restrictions that were in place before and after July 18, 2017. (Depo. of CSI, 12:4–16). When Large saw two CSI trucks operating on CSAH 10 on July 18, 2017, and motioned that they should pull over, Large then called local law enforcement to the scene to handle the matter further. At that point, any reasonable driver would have been further assured that Large could not compel the drivers to remain in place pending the arrival of law enforcement.

As no "seizure" occurred on July 18, 2017, and any "seizure" that did occur was reasonable as a matter of law given the circumstances and Large's personal knowledge of

CSI's intent to operate on CSAH 10 without approval from its contracting partner, CSI's Fourth Amendment claim fails.

**B.**   **Plaintiff's Fourteenth Amendment Procedural Due Process Claim Fails As A Matter Of Law Because Plaintiff Was Not Deprived Of A Fourteenth Amendment Property Interest, And Even If It Was, Plaintiff Was Afforded Due Process.**

"Procedural due process claims require a two-step analysis. Initially, a plaintiff must demonstrate that the state deprived him of some 'life, liberty, or property' interest. If successful, the plaintiff must then establish that the state deprived him of that interest without sufficient 'process.'" *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000). "Nothing in [the Fourteenth] Amendment protects against *all* deprivations of life, liberty, or property by the State." *Parratt v. Taylor*, 451 U.S. 527, 537 (1981) (emphasis added). The Fourteenth Amendment merely protects against such deprivations where some type of process is due and is not provided. *Id.* Due process simply requires that a person have, "at a meaningful time and in a meaningful manner, an opportunity to challenge the seizure of his property." *Allen v. City of Kinloch*, 763 F.2d 335, 336 (8th Cir. 1985).

CSI has failed to demonstrate that it was deprived of any property interest, and even if it was, due process was satisfied because CSI had notice of the weight restriction change, and had a remedy under state law if an actual deprivation of property occurred. Had the State or the County wrongfully seized a CSI truck following the "traffic stop," state law provides a remedy. Additionally, a loaded CSI truck would not have met the weight restrictions in place on CSAH 10 prior to July 18, 2017. (Depo. of CSI, 12:4–16). At the time of the "traffic stop," Large did not know whether the two trucks at issue were loaded

or not. (Aff. of Large, ¶ 18). It is beyond dispute that a vehicle may be pulled over by government actors upon reasonable suspicion of a violation of traffic laws. *United States v. Dillard*, 825 F.3d 472, 474 (8th Cir. 2016).

Setting this aside for the moment, the Court should recognize that this is simply not the type of situation that the Due Process clause was designed to address. "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). The Court should be highly skeptical of overly technical arguments which waste judicial resources and "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Id.* (*citing Paul v. Davis*, 424 U.S. 693, 701 (1976)).

**C.    Plaintiff's Equal Protection Claim Fails As A Matter Of Law Because Plaintiff Cannot Show That It Was Treated Separately Or That The County's Weight Restrictions Were Selectively Enforced.**

Although CSI has not plead an Equal Protection violation in the Amended Complaint, CSI made a vague allegation of an Equal Protection violation in response to the defendants' earlier motion to dismiss in this case [Doc ID#37]. CSI alleges that the County "deprived CSI of equal protection of the laws by selectively changing road weight limits to damage CSI and then selectively enforcing those weight limit changes only against CSI." (Pl. Br. in Opp. to Mot. to Dismiss [Doc ID#45], p. 7). CSI appears to challenge both the implementation of the weight restrictions on July 18, 2017, as well as the interaction between Large and CSI's drivers on that same date.

"To establish a violation of equal protection based on selective enforcement, a plaintiff must ordinarily show that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Advantage Media, LLC v. City of Hopkins*, 379 F.Supp.2d 1030, 1045–46 (D. Minn. July 29, 2005) (*citing LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). Where a plaintiff constitutes a "class of one" for equal protection purposes and does not allege membership as part of a class or group, a plaintiff must establish (1) that he has been treated differently than others similarly situated; and (2) that there is no rational basis for the difference in treatment. *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). CSI cannot establish a cognizable claim under either standard and so its pretended Equal Protection claim fails.

CSI has no evidence which supports the allegation that the weight restrictions themselves were somehow discriminatory. This is true for both the weight restrictions that were *already in place* on CSAH 10 prior to July 18, 2017, as well as the reduced weight restrictions put in place that day. Weight restrictions do not apply to one person or the other, but to all drivers equally. CSI lacks sufficient evidence to support its bare allegation that the pre-existing weight restrictions, or the weight restrictions put in place on July 18, 2017, targeted CSI alone. As CSI was operating in a County work zone and had declared that it would not honor its obligations to MnDOT in terms of working with the County to

arrange for hauling on County roads, the County and Large had a rational basis for any difference in treatment.

## IV. PLAINTIFF'S TRESPASS TO CHATTELS CLAIM FAILS AS A MATTER OF LAW.

CSI's trespass to chattel claim fails because CSI cannot establish intent, and because no actionable trespass has occurred. "One who dispossesses another of a chattel is subject to liability in trespass for the damage done." *Herrmann v. Fossum*, 270 N.W.2d 18, 20 (Minn. 1978) (*quoting* Restatement (Second) of Torts, § 222). "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Olson v. Labrie*, No. A12-1388, 2013 WL 1788531, *3 (Minn. App. Apr. 29, 2013) (unpublished) (*quoting* Restatement (Second) of Torts, § 217). "Liability arises if the defendant dispossesses the possessor of chattel, impairs its condition, quality, or value, or deprives the possessor of the chattel's use for a substantial period of time." *Id.*

> Dispossessing includes taking the chattel from the person in possession without his consent, obtaining possession of the chattel by fraud or duress, "barring the possessor's access to the chattel," or destroying the chattel while it is in another's possession. "Intermeddling" means intentionally coming into physical contact with the chattel. Liability arises if the defendant dispossesses the possessor of the chattel, impairs its condition, quality, or value, or deprives the possessor of the chattel's use for a substantial period of time.

*Strei v. Blaine*, 996 F.Supp.2d 763, 792 (D. Minn. Feb. 12, 2014) (*quoting Olson v. Labrie*, No. A12-1388, 2013 WL 1788531, *3 (Minn. App. Apr. 29, 2013) (unpublished)).

The Restatement provides that a trespass to chattel is not actionable where it does no harm to the chattel or any other legally protected interest of the possessor. Restatement

(Second) of Torts, § 217 cmt. (a). A claim for trespass to chattel fails unless the alleged control over the plaintiff's personal property was wrongful or without lawful justification. *Strei v. Blaine*, 996 F.Supp.2d 763, 792 (D. Minn. Feb. 12, 2014). Conversion and trespass to chattel differ "only in degree," and the torts reflect a remedy for "an offense against *possession* of property" that "consists of an act in derogation of the plaintiff's *possessory* rights." *Wilkinson v. United States*, 564 F.3d 927, 932 (8th Cir. 2009) (applying the Restatement) (emphasis in original).

CSI's trespass to chattel claim fails for two reasons, in addition to Large's legal justification as a county engineer supervising an active county work zone and qualified immunity defense set forth above. First, CSI's claim fails because CSI lacks evidence to show that there was an intentional interference with CSI's possessory rights in and to its trucks. Second, because CSI fails to establish an actionable trespass to chattel claim as a matter of law.

**A.     CSI's Claim Fails Because CSI Cannot Prove Intent To Interfere With CSI's Possessory Or Ownership Right In Its Trucks.**

CSI's claim fails because CSI lacks critical evidence to show that there was an intentional interference with CSI's possessory right in its trucks. Minnesota is in the majority of states that hold that there can be no unintended "trespass" to chattel. *See, e.g.*, *MCI Communications, Inc. v. Maverick Cutting and Breaking LLC*, 374 F.Supp.3d 789, 806 (D. Minn. Mar. 12, 2019); Restatement (Second) of Torts, § 217 cmt. (b). In other words, a plaintiff must establish an intention to dispossess or intermeddle on the part of the defendant. Under these facts, CSI lacks sufficient evidence for a jury to conclude that Large

or the County intended to interfere substantially with CSI's right to ownership interest in its trucks. CSI's claim for trespass to chattel therefore fails. Large contacted law enforcement a matter of minutes after the stop. Large was informed by law enforcement that officers were not available immediately. Large had no way of knowing, at the time of the stop, that the law enforcement response would take so long to respond. (Aff. of Large, ¶ 19). No reasonable jury could conclude from the record that Large or the County intentionally attempted to interfere with CSI's right to possess or own its trucks, and summary judgment is appropriate.

**B.    CSI's Claim Fails Because No Actionable Trespass Has Occurred Or Has Been Alleged.**

CSI's claim also fails because CSI's trespass to chattel claim is not actionable as a matter of law. CSI alleges that its trucks were stopped for three hours. (Am. Compl., ¶ 25). However, Large called law enforcement immediately after the encounter began, and the duration of the stop was simply spent waiting for a law enforcement officer to arrive on the scene. (Aff. of Large, ¶ 19). Courts in Minnesota and elsewhere hold that where an intrusion upon control over personal property is limited in duration, there is no actionable trespass to chattel claim. *See, e.g.*, *Koepnick v. Sears Roebuck & Co.*, 762 P.d2d 609, 617–618 (Ariz. Ct. App. 1988) (brief minutes-long investigatory search of vehicle not a trespass).

CSI's ownership and possession of the trucks at issue was never called into question by Large or the County. Indeed, the very reason that law enforcement was called to the scene was *because of* CSI's ownership interest in the trucks. CSI's drivers were present

throughout the encounter, and the trucks remained under the control of those drivers for the duration of the encounter. Neither Large nor the County ever exercised the degree of "dominion or control" over the chattel or challenged CSI's ownership interest in the same sufficient to support a claim for trespass to chattel, and so the claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the defendants respectfully request that their Motion for Summary Judgment be GRANTED in its entirety and that plaintiff's claims be dismissed with prejudice.

<div style="margin-left:40%">

Respectfully submitted,

PEMBERTON LAW, P.L.L.P.

</div>

Date:  May 1, 2020          **s/ Michael T. Rengel**
                            Michael T. Rengel, No. 169432
                            Ryan D. Fullerton, No. 0398363
                            Attorneys for Defendants
                            110 North Mill Street
                            Fergus Falls, Minnesota  56537
                            Telephone:  218-736-5493
                            Fax:     218-736-3950
                            Email:  m.rengel@pemlaw.com
                                    r.fullerton@pemlaw.com

MTR:RDF:cg:sb
2017-3320
05/01/2020